State of New York
Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 20
Nafeesa Syeed,
    Appellant,
  v.
Bloomberg L.P.,
    Respondent.

Niall MacGiollabhui, for appellant.
Elise M. Bloom, for respondent.
Cleland B. Welton II, for State of New York et al, amici curiae.
Anti-Discrimination Center, Inc. et al., amici curiae.

SINGAS, J.:

    The New York City Council and the New York State Legislature have enacted laws banning discrimination, including employment discrimination, from within their geographic boundaries. In response to a question certified by the United States Court of

- 1 -

- 2 -  No. 20

Appeals for the Second Circuit, we hold that the New York City and New York State Human Rights Laws each protect nonresidents who are not yet employed in the city or state but who proactively sought an actual city- or state-based job opportunity.

I.

Plaintiff Nafeesa Syeed, a South Asian-American woman, filed this suit against defendant Bloomberg L.P., asserting employment discrimination claims. She alleges that, in 2014, she began working for defendant, a privately held company with global headquarters in New York City. Defendant operates Bloomberg Media, a news organization that employs reporters, editors, and producers throughout the world.

Plaintiff's complaint alleged that she was subjected to discrimination on account of her sex and race while working as a reporter in defendant's Washington, D.C. bureau. In 2018, after plaintiff concluded that she could no longer advance her career in the Washington, D.C. bureau, she "appl[ied] for various positions" at defendant's New York bureau, including "the New Economy Forum Editor position." In addition, plaintiff "affirmed her interest" to her Washington, D.C. team leader concerning an open United Nations (U.N.) reporter position that was based in New York, and subsequently "inquired multiple times" about that job. The U.N. vacancy ultimately was filled by a man who allegedly had less practical experience than plaintiff and less formal education. After her managing editor in Washington, D.C. told plaintiff that defendant decided not to convert the U.N. job to a " 'diversity slot,' " she understood that she would only be considered for promotions to positions identified as such. In June 2018, claiming that she was constructively discharged, plaintiff informed her team leader and managing editor that she

- 3 -                                                                                                                                   No. 20

could no longer work for defendant because of the discrimination that she had encountered and left defendant's employ.

Two years later, plaintiff, then a California resident, commenced this class action in New York State court. She asserted, among other causes of action, individual claims under the State and City Human Rights Laws. Plaintiff maintained that defendant discriminated against her on the basis of sex and race by denying her promotions.

After defendant removed the case to federal court, the United States District Court for the Southern District of New York granted defendant's motion to dismiss all of plaintiff's claims under both Human Rights Laws (*see* 568 F Supp 3d 314, 349 [SD NY 2021]). Concerning plaintiff's failure to promote claims, the court, relying on our decision in *Hoffman v Parade Publs.* (15 NY3d 285 [2010]), held that plaintiff could not show that defendant's conduct impacted her in New York State or City (*see* 568 F Supp 3d at 330). The court read *Hoffman* and its progeny to hold that the Human Rights Laws are limited to people who live or work in New York (*see id.* at 333). Because plaintiff alleged neither and her claims instead rested "solely on her allegations that . . . she applied for, and was denied, certain New York-based positions," the court held that plaintiff's allegations failed to state a claim under the Human Rights Laws (*id.* at 330). The court acknowledged, however, that other cases from the Southern District had reached the opposite conclusion in analogous circumstances (*see id.* at 330-331; *see e.g. Chau v Donovan*, 357 F Supp 3d 276, 283-284 [SD NY 2019]; *Anderson v HotelsAB, LLC*, 2015 WL 5008771, *3-4, 2015 US Dist LEXIS 111820, *10-12 [SD NY, Aug. 24, 2015, No. 15CV712 (LTS-JLC)]).

The Second Circuit reserved decision on plaintiff's appeal and certified the following question to this Court:

> "Whether a nonresident plaintiff not yet employed in New York City or State satisfies the impact requirement of the New York City Human Rights Law or the New York State Human Rights Law if the plaintiff pleads and later proves that an employer deprived the plaintiff of a New York City- or State-based job opportunity on discriminatory grounds" (58 F4th 64, 71 [2d Cir 2023]).

The court concluded that *Hoffman* "was silent as to whether, in discriminatory failure-to-hire or failure-to-promote cases, a nonresident plaintiff" would be "unable to assert sufficient personal impact in New York City or State" (*id.* at 68). The Second Circuit explained that "[c]ertain portions of *Hoffman* seem to imply that nonresidents can satisfy the . . . impact requirement only if they currently work in New York City or State" (*id.*). However, the Second Circuit noted that *Hoffman* left open the possibility that its impact test might be satisfied by "those who *would* work in New York City or State absent discrimination" (*id.* at 69). Given the policy implications involved and the lack of controlling authority, the Second Circuit determined that certification was appropriate.

We accepted the certified question (*see* 39 NY3d 1061 [2023]), and answer it in the affirmative.

II.

The State and City Human Rights Laws proscribe employment discrimination based on, among other grounds, race and either sex or gender (*see* Executive Law § 296 [1] [a]; Administrative Code of City of NY § 8-107 [1] [a] [2]). Both statutes have provisions directing that they be liberally construed to accomplish the remedial purposes that they

serve (*see* Executive Law § 300; Administrative Code § 8-130 [a]). "Exceptions to and exemptions from" both statutes "shall be construed narrowly in order to maximize deterrence of discriminatory conduct" (Executive Law § 300; Administrative Code § 8-130 [b]). Courts must construe the Human Rights Laws "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio v City of New York*, 16 NY3d 472, 477-478 [2011]; *see Makinen v City of New York*, 30 NY3d 81, 88 [2017]). Applying this mandate to interpret these laws broadly, we turn to the question presented.

*Hoffman* established an "impact" test for nonresidents seeking to assert claims under the State and City Human Rights Laws. There, the plaintiff was a Georgia resident who worked in Atlanta for the defendant, a company headquartered in New York City. Claiming that his termination violated the Human Rights Laws, the plaintiff commenced an age discrimination action in New York where the decision to fire him was made. We concluded that "nonresidents of the city and state must plead and prove that the alleged discriminatory conduct had an impact within those respective boundaries" (15 NY3d at 289). We emphasized that "the impact requirement does not exclude all nonresidents from [the] protection" of the Human Rights Laws (*id.* at 290). Instead, the impact test "expands" the protections of the Human Rights Laws "to nonresidents who work in the" state or city (*id.*) and to those who "state a claim that the alleged discriminatory conduct had any impact in either of those locations" (*id.* at 292). *Hoffman* therefore sets forth two ways in which a nonresident may satisfy the impact requirement: (1) working in New York or (2) establishing that the challenged conduct had some impact on the plaintiff within the

- 6 -                                                                                                          No. 20

respective New York geographic boundaries. Applying the impact rule in *Hoffman*, we held that the plaintiff's discriminatory termination claims failed because he "was neither a resident of, nor employed in, the City or State of New York," and he failed to allege that the purported discrimination "had any impact in" New York (*id.*).

III.

The Second Circuit has asked us to explain how *Hoffman*'s impact test governs a situation where, as here, a nonresident plaintiff alleges a failure to promote or hire.[1] We conclude that the City and State Human Rights Laws protect nonresidents who proactively sought an actual New York City- or State-based job opportunity.

For purposes of the impact test, a failure to hire or promote case is distinct from a discriminatory termination case, like *Hoffman*. Citing Executive Law § 290 (3) and Administrative Code § 8-101, *Hoffman* turned on those statutes' use of the terms "inhabitants" and persons "within the state" (*see also* Executive Law § 290 [2] [covering "the people of this state"]). But the plaintiff in *Hoffman* was not a New York inhabitant and did not seek to become one. Indeed, the plaintiff was a Georgia resident who worked in Georgia and wished to retain his Georgia employment. By contrast, a nonresident who engaged in affirmative conduct to obtain an actual job opportunity based in New York City or State sought to become an inhabitant or person within those geographical boundaries (*see Chau*, 357 F Supp 3d at 284 [because the plaintiff alleged that "she would have taken

---

[1] The certified question presumes that *Hoffman*'s impact test applies here. Plaintiff concedes that the test governs this matter and does not request that we revisit our holding in *Hoffman*.

a position in New York City had she not been discriminated against, she has satisfied the requirement that the alleged discriminatory act had an impact within the boundaries of New York City"]; *Anderson*, 2015 WL 5008771, *4, 2015 US Dist LEXIS 111820, *12 [the plaintiff's "rejection from the position denied her the opportunity to work in New York City, thus providing the necessary New York City workplace nexus for her claim of a" City Human Rights Law covered injury]).

Unlike the plaintiff in *Hoffman*, a nonresident who has been discriminatorily denied a job in New York City or State loses the chance to work, and perhaps live, within those geographic areas.[2] The prospective employee personally feels the impact of a discriminatory refusal to promote or hire in New York City or State, because that is where the person wished to work (and perhaps relocate) and where they were denied the chance to do so. When applying the required liberal construction of "inhabitants" and "individual within this state" (Executive Law § 290 [3]; Administrative Code § 8-101), a prospective inhabitant or employee, who was denied a job opportunity because of discriminatory conduct, fits comfortably within the Human Rights Laws' protection.

Our conclusion is buttressed by important policy considerations specifically addressed in the Human Rights Laws. New York State has declared that a "failure to provide"

> "every individual within this state . . . an equal opportunity to enjoy a full and productive life . . . , whether because of

---

[2] The certified question seeks guidance with respect to "a New York City- or State-based job opportunity" (58 F 4th at 71), which we understand to mean a position that requires the employee to be physically present in New York. Our analysis is limited to that scenario.

>discrimination, prejudice, [or] intolerance . . . not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants" (Executive Law § 290 [3]).

Similarly, New York City has "declare[d] that prejudice, intolerance, bigotry, and discrimination, bias-related violence or harassment and disorder occasioned thereby threaten the rights and proper privileges of its inhabitants and menace the institutions and foundation of a free democratic state" (Administrative Code § 8-101; *see id.* [stating that there is "no greater danger to the . . . welfare of the city . . . than the existence of groups prejudiced against one another"]). Thus, as amici curiae State of New York and City of New York argue, the Human Rights Laws contemplate that discrimination harms the state and city as governmental institutions, in addition to the targeted individual. The state and the city are deprived of economic and civic contributions from individuals discriminatorily denied the opportunity to work in New York, along with the more diverse workforces and communities that the individuals would advance. Our resolution of the certified question has the beneficial effect of protecting New York institutions and the general welfare of the state and city—as the legislature and city council intended.

The Second Circuit recognized that a ruling for defendant "would serve to immunize employers from liability" under the Human Rights Laws "for discriminatory conduct pertaining to New York City- or State-based jobs" even when the discriminatory conduct has an impact in New York (58 F4th at 71). We cannot conclude that the legislature and city council intended to give New York employers a license to discriminate against

- 9 -                                                                                                                  No. 20

nonresident prospective employees and, thus, we may not adopt such a narrow construction of the statutes. Accordingly, the certified question should be answered in the affirmative.


Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, certified question answered in the affirmative. Opinion by Judge Singas. Chief Judge Wilson and Judges Rivera, Garcia, Cannataro, Troutman and Halligan concur.

Decided March 14, 2024